1

2

3

4

5
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6

7
LARRY LLOYD,

8
                          Plaintiff,

9
        v.                                            No. C09-5734 BHS/KLS

10
CHIEF MICHAEL POWELL,                        **REPORT AND RECOMMENDATION**
SERGEANT ED KLAHN,                            **Noted for: November 26, 2010**

11
CORRECTIONAL OFFICER PROSE,
DOCTOR PHYSICIAN FREEHA F.

12
BOKHARI, M.D.,

13
                          Defendants.

14
        Before the court is the Motion for Summary Judgment of Fork City Defendants Mike

15
Powell, Ed Klahn and Lex Prose. ECF No. 86.[1]  Plaintiff filed a response. ECF No. 112-1.

16
Fork City Defendants filed a reply. ECF No. 115.  Plaintiff filed "Objections" to Fork City

17
Defendants' reply. ECF No. 121.

18
        Having carefully reviewed the motion, opposition, supporting affidavits and evidence,

19

20
and balance of the record, the undersigned finds that the motion should be granted as Plaintiff

21
has failed to establish a violation of his constitutional rights under 42 U.S.C. § 1983.

22
                                    **SUMMARY OF CASE**

23
        Plaintiff Larry Lloyd claims that he contracted food poisoning from a "T.V. Style

24
Dinner" served to him at the Forks City Jail on November 15, 2008.  He was taken to the Forks

25

26
_____

[1] Plaintiff's claims against the treating physician at the Forks Community Hospital have been dismissed with
prejudice.  ECF No. 75.

REPORT AND RECOMMENDATION - 1

Community Hospital where he was treated, kept for observation, and discharged the next day after his symptoms improved and test results indicated no cause for further hospitalization.

Mr. Lloyd filed suit against Mike Powell, Chief of Police for the City of Forks Police Department; Ed Klahn, a Sergeant for the City of Forks Police Department; and, Lex Prose, a correctional officer at the City of Forks Jail ("Forks City Defendants"). He also sued Dr. Freeha F. Bokhari, the treating emergency room physician at the Forks General Hospital. His claims against Dr. Bokhari have been dismissed with prejudice. ECF No. 75.[2]

The claims against the Forks City Defendants include that (1) Defendant Prose forced Mr. Lloyd to leave the hospital before Dr. Bokhari had completed his medical tests, kept him from seeking a scheduled follow-up, and refused him the "right to seek any form of medication if needed"; (2) Fork City Defendants Powell and Klahn ignored his pain; (3) he was placed in segregation for "at best ten days" for filing a grievance; and, (4) Fork City Defendants transferred him to the Kitsap County Jail where he could be better monitored in retaliation for his medical complaints and grievances. Mr. Lloyd claims that he now suffers from kidney damage and "gastroentero reflex" because Sergeant Klahn failed to provide him with nutritionally adequate food.

Mr. Lloyd asks that the Forks City Defendants be ordered to desist in serving spoiled food, from interfering with the orders of medical personnel, and help pay for a new kidney in the future in the event his "other" kidney fails him.

---

[2] Mr. Lloyd claimed, in part, that Dr. Bokhari failed to diagnose that he had suffered food poisoning; however, tests performed at the hospital showed no toxins or damage to Mr. Lloyd's kidneys. Over a month after his release from the hospital, Mr. Lloyd made a written request of Dr. Bokhari to change or modify the medical record to reflect that he had sustained a kidney injury. ECF No. 21, p. 3. She refused to do so because she did not believe that Mr. Lloyd suffered kidney damage. *Id.* This court ruled that Mr. Lloyd had not presented any evidence of "toxic poisoning to his kidneys." ECF No. 45, p. 8.

REPORT AND RECOMMENDATION - 2

**FACTS RELATING TO CLAIMS AGAINST FORKS CITY DEFENDANTS**

On November 5, 2008, Mr. Lloyd was transferred to the City of Forks Jail under a contract with Bremerton.[3]  ECF No. 4, p. 10 (Plaintiff's Complaint).  The Forks Jail has a maximum capacity of approximately 32 inmates.  ECF No. 90, ¶ 3 (Declaration of Mike Powell).  At any given time, only one or two corrections officers are on duty to run the jail and supervise the inmates.  *Id.*  The Forks Jail does not have any medical staff on-site.  *Id.*  If a prisoner is experiencing medical problems, he is transported to a medical facility, which is usually the Forks Community Hospital.  *Id*.

On November 15, 2008, Mr. Lloyd was served a TV-style dinner at the Forks Jail at about 6:00 p.m.  ECF No. 4, ¶ 3.  Plaintiff reports that approximately 30 to 45 minutes after consuming his dinner, he felt sick to his stomach and had to use the restroom.  *Id.*, ¶ 6.  He had diarrhea at approximately 7:15 p.m., started feeling nausea, and experienced abdominal pain and cramps.  *Id*. at pp. 10-11.

Mr. Lloyd states he spoke with Sgt. Ed Klahn between 7:30 p.m. and 8:00 p.m., and Sgt. Klahn informed Mr. Lloyd that he was moving to another unit.  ECF No. 4, p. 11, ¶ 12.  Plaintiff continued to feel worse and asked to see a doctor.  *Id.*, pp. 11-12.  At lights out, Plaintiff started hitting his cell door, seeking officer attention.  *Id.*, p. 13, ¶ 22.

Sgt. Klahn arranged to have Mr. Lloyd transported to the Forks Community Hospital, where he could receive medical attention.  ECF No. 88, ¶ 4 (Declaration of Ed Klahn); ECF No. 89, ¶ 3 (Declaration of Lex Prose).  Audrey Decker, a corrections officer in training at the time,

---

[3] Jail records show plaintiff was actually transferred on November 7, 2008.  ECF No. 90, Exh. E.

was the only officer on duty at the jail that evening.   For safety and security reasons, the jail does not have fewer than two officers on duty to assist in the jail at any given time, so Sgt. Klahn arranged for Officer Prose, who was off-duty, to come in and transport Mr. Lloyd to the hospital. ECF No. 88, ¶ 4; ECF No. 89, ¶ 3.  Mr. Lloyd was moved to a different area of the jail while he was awaiting transport so that Officer Decker could closely monitor him, in the event his condition worsened and an ambulance was needed.   ECF No. 88, ¶ 4.  Plaintiff was also given three Tums antacid at 2100 hours.  *Id*., Ex. A.  At 1210 hours, Officer Prose transported Mr. Lloyd to the Forks Community Hospital, where Mr. Lloyd was treated by Dr. Bokhari.  ECF No. 89, ¶ 3; ECF No. 21, pp. 1-4 (Affidavit of Bokhari); and, ECF No. 89, ¶¶ 2-4 (Declaration of Freeha Bokhari).

Officer Prose remained in the room with Mr. Lloyd while Dr. Bokhari treated him.  ECF No. 89, ¶ 3.  Dr. Bokhari decided to admit Mr. Lloyd into the hospital overnight.  ECF 89, ¶ 3; ECF No. 21, pp. 1-4.  Officer Prose did not observe Mr. Lloyd experience vomiting or diarrhea while he was in the hospital, and Mr. Lloyd only used the bathroom to urinate.  ECF No. 89, ¶ 3.

Dr. Bokhari discharged Mr. Lloyd on the morning of November 16, 2008, and Officer Prose transported him back to the Forks Jail.  ECF No. 88, ¶ 5; ECF No. 89, ¶¶ 3-4.  Dr. Bokhari indicated that Mr. Lloyd was in good health and there was no need for further care, unless his symptoms worsened, in which case jail staff should schedule a follow-up appointment.  ECF No. 88, ¶¶ 5-6, Ex. B; ECF No. 89, ¶ 4.  Dr. Bokhari diagnosed Mr. Lloyd with "elevated creatine kinase likely related to muscle damage of unknown etiology," and "gastroenteritis."  ECF No. 23, Exh. 1, p. 2.  She noted that his last bowel movement was on the morning of November 15, 2008.  *Id.*, p. 1.

REPORT AND RECOMMENDATION - 4

Mr. Lloyd signed the discharge form deeming him fit to return to jail. *Id.* Dr. Bokhari made the decision to discharge Mr. Lloyd from the hospital and would not have done so had she felt he required further medical care at the hospital. ECF No. 89, ¶ 4; ECF No. 87, ¶ 4. Dr. Bokhari states that Mr. Lloyd was released once she was satisfied, in her independent medical judgment, that his condition warranted discharge. ECF No. 87, ¶ 4. According to Dr. Bokhari, the removal of Mr. Lloyd's IV was done appropriately and in a manner consistent with good medical care. *Id.* Officer Prose had no involvement in the decision to discharge Mr. Lloyd. ECF No. 89, ¶ 4. Officer Prose did not hurry Dr. Bokhari or any medical staff and never commanded anyone to remove Mr. Lloyd's IV. *Id.* Mr. Lloyd admits that it was Dr. Bokhari who discharged him. *See,* ECF No. 42, p. 7.

Dr. Bokhari never conveyed to Officer Prose, Sgt. Klahn or any other member of the jail staff, that Mr. Lloyd was suffering or had suffered from food poisoning, kidney poisoning or that Mr. Lloyd had any serious medical condition. ECF No. 88, ¶ 5; ECF No. 89, ¶ 7. Sgt. Klahn denies that he told Plaintiff that Dr. Bokhari had ever made such statements. *Id.*

After his discharge from the hospital, Mr. Lloyd submitted two grievances claiming that he had suffered food poisoning. ECF No. 88, ¶ 6, Ex. C; ECF No. 90, ¶ 5, Ex. C.) After interviewing other inmates, Sgt. Klahn learned that no other inmates had any sickness or complaints after dinner on November 15, 2008. ECF No. 88, ¶ 6, Ex. C.) Hospital medical staff never indicated that Mr. Lloyd had food poisoning or kidney issues. *Id.* Sgt. Klahn checked and made sure that the frozen meals served on November 15, 2008 were not more than three or four months old, in accordance with USDA standards. *Id.* He did not find any evidence that supported Mr. Lloyd's contention that he suffered from food poisoning. *Id.*

REPORT AND RECOMMENDATION - 5

Chief Powell met with Mr. Lloyd on November 19, 2008 to discuss his grievances. ECF No. 90, ¶ 6. Mr. Lloyd claimed that Corrections Officer Lex Prose rushed the hospital staff to discharge him on November 16, 2008 and unhooked his IV. *Id.* Mr. Lloyd also complained that he had been denied follow-up care. *Id.* Upon investigation, Chief Powell found Mr. Lloyd's complaints to be unsupported. *Id.* Mr. Lloyd appeared in fine health when Chief Powell spoke with him and had no apparent discomfort or difficulty. *Id.* Chief Powell found Mr. Lloyd's grievance to be unfounded and denied it. *Id.* Mr. Lloyd did not complain of any illness or discomfort during Chief Powell's visit with him. *Id.*, ¶ 6. He gave Chief Powell no indication that he was experiencing any illness or other medical issues. *Id.* Chief Powell addressed all of Mr. Lloyd's grievances and left on good terms. *Id.* Chief Powell states that whatever Mr. Lloyd's ailments were on November 15, 2008, they had resolved. *Id.*

On November 19, 2008, Mr. Lloyd also submitted an Inmate Request Form, indicating he had a follow-up appointment scheduled with Dr. Bokhari on November 20, 2008. ECF No. 88, ¶ 7, Ex. D. Mr. Lloyd asked that jail staff bring his DSHS coupon booklet, which was in his wallet, to the hospital. *Id.* Sgt. Klahn arranged for this to happen. *Id.* Corrections Officer Brandon Leask transported Mr. Lloyd to his follow-up appointment at the Bogachiel Clinic at the Forks Community Hospital on November 20, 2008. *Id.* Mr. Lloyd was examined by Dr. Kathy Shannon. *Id.* Dr. Shannon performed lab work and indicated she would send the results to the jail. *Id.*, Ex. E. Dr. Shannon circled "Yes" after the question, "Is Patient Fit for Jail?" *Id.*; ECF No. 23, Ex. 1, p. 10.

On November 23, 2008, Mr. Lloyd submitted an Inmate Request Form, which he filled out at 8:00 p.m. ECF No. 88, ¶ 8, Ex. F. Mr. Lloyd stated that his kidney and stomach were hurting and he wanted to see a doctor. *Id.* On November 24, 2008, Mr. Lloyd submitted another

Inmate Request Form, again complaining of kidney pain and claiming he was being denied follow-up care. *Id.*, Ex. G. In response to this request, Sgt. Klahn contacted Mr. Lloyd, who stated that he wanted to see the doctor again. *Id.* Sgt. Klahn called the Bogachiel Clinic and clinic staff faxed Mr. Lloyd's lab results from the blood work performed on November 20, 2008 to Sgt. Klahn. *Id.*, Ex. H. In that fax, Dr. Shannon stated that Mr. Lloyd did not require any medication. *Id.* She also noted on the lab reports that Mr. Lloyd's results were "all good." *Id.*

In further follow-up to Mr. Lloyd's request to see Dr. Bokhari again, Sgt. Klahn called the Bogachiel Clinic on the morning of November 25, 2008 and spoke with receptionist Jana Williams. ECF No. 88, ¶ 9. Ms. Williams indicated that Dr. Bokhari would not be in until December 3, 2008, so Sgt. Klahn asked her to have Dr. Kathy Shannon call him back to discuss Mr. Lloyd's condition. *Id.*, Ex. G. Dr. Shannon called Sgt. Klahn back and he conveyed to her that Mr. Lloyd was complaining of stomach pain and kidney pain. *Id.* Dr. Shannon said she was not concerned about his condition, but requested that Sgt. Klahn send her a urine sample from Mr. Lloyd. *Id.* Mr. Lloyd agreed to provide a urine sample, but was unhappy because he was not allowed to go to the clinic. *Id.* Sgt. Klahn advised Mr. Lloyd that Dr. Bokhari would not return to the clinic until December 3, 2008 and Mr. Lloyd said, "okay," or words to that effect. Sgt. Klahn took this assent to mean that Mr. Lloyd had no objection to waiting to see Dr. Bokhari. *Id.* Sgt. Klahn states that he never told Mr. Lloyd that the doctor said Mr. Lloyd had contracted food poisoning or that he had "toxic poisoning" in his kidney. *Id.*

Mr. Lloyd's urine sample was taken to the Bogachiel Clinic on November 26, 2008. ECF No. 88, ¶ 10, Exh. I. The transport officer was unable to take the sample to the clinic on November 25, 2008 because he was involved in a rape case. *Id.*

At 8:50 a.m. on December 1, 2008, Mr. Lloyd submitted a grievance against Sgt. Klahn

REPORT AND RECOMMENDATION - 7

claiming that Sgt. Klahn was denying him the right to follow-up medical care. ECF No. 88, ¶ 11, Ex. J. In response, Sgt. Klahn stated that he was awaiting the results of Mr. Lloyd's urinalysis. Dr. Shannon had indicated that Mr. Lloyd was not suffering from any cognizable illness and said that she would wait and see what his urinalysis results showed. *Id.*

Mr. Lloyd submitted a similar Medical Request Form on December 1, 2008. *Id.*, Ex. K. Sgt. Klahn responded and notified Mr. Lloyd that he was awaiting the results of the urinalysis, consistent with Dr. Shannon's instructions. *Id.*

On December 2, 2008, Mr. Lloyd submitted another Inmate Medical Request Form, complaining that his penis was leaking after urination. ECF No. 88, ¶ 12. Sgt. Klahn responded to this medical request on December 3, 2008, indicating that jail staff was in the process of making plans to send him to a different facility that could more closely monitor his condition. *Id.*, Ex. K.

On December 2, 2008, Mr. Lloyd argued with Officer Prose and he was placed in a segregated cell. ECF No. 88, ¶ 14; ECF No. 89, ¶ 6, Ex. A; ECF No. 90, ¶ 6, Ex. D. Mr. Lloyd rang the buzzer for assistance and another corrections officer in-training, Audrey Decker, told him to wait because she was busy. ECF No. 89, ¶ 6. Mr. Lloyd rang the buzzer again and demanded attention. *Id.* Officer Prose spoke with Mr. Lloyd and told him to comply with Officer Decker's request to wait, but Mr. Lloyd began arguing with him. *Id.* Mr. Lloyd states that he did not argue with Officer Prose on December **1**, 2008. ECF No. 113, p. 73 (emphasis added).

Failure to obey a command of a corrections officer and disruptive behavior are infractions under the Forks Jail Policies and Procedures and under the Washington Administrative Code. ECF No. 89, ¶ 6, Ex. A. These are serious offenses, in part, because

they are known to encourage other inmates to be disobedient and may incite riots. *Id.*

According to Sgt. Klahn, Mr. Lloyd was moved to a segregated unit (SHU 2) on December 2, 2008 for disciplinary reasons after Mr. Lloyd argued and became verbally combative with Officer Prose.

Another reason for placing Mr. Lloyd in SHU 2 was the fact that he was causing too many disturbances among the other inmates. ECF No. 89, ¶ 6; ECF No. 88, ¶ 14; ECF No. 90, ¶ 8, Exs. F and G (complaints from fellow inmates). Because the Forks Jail is so small and has so few staff members, one disruptive inmate can drain resources and disrupt the processes of the jail. ECF No. 90, ¶ 8. Mr. Lloyd's behavior created that type of disruption at the jail. *Id.* Aside from written complaints, jail staff also received verbal complaints regarding Mr. Lloyd's behavior on a daily basis. *Id.* Mr. Lloyd intimidated the other inmates and failed to get along with them in a harmonious nature, which disrupted the operation of the jail. *Id.*; ECF No. 88, ¶ 14. Several inmates were afraid of Mr. Lloyd because he could be verbally abusive and threatening. *Id.* A fellow inmate wrote to complain of Mr. Lloyd's bullying and threatening behavior. *Id.*, ¶ 8, Exh. E. On December 2, 2008, the day Mr. Lloyd was moved to SHU 2, four of his fellow inmates sent a "kite" requesting that Mr. Lloyd not be placed in the same cell as them. *Id.*, ¶ 8, Exh. G.

Sgt. Klahn felt that best way to avoid subjecting other inmates to Mr. Lloyd's abusive behavior and threats was to segregate him and, in light of his constant medical complaints, segregation would also be appropriate as the jail does not have a designated holding cell for inmates complaining of illness. *Id.*; ECF No. 90, ¶ 6, Exhs. D and E.

Mr. Lloyd was in SHU 2 for only three days, from December 2, 2008 thru December 5, 2008. ECF No. 90, ¶ 6, Exh. D and E. Mr. Lloyd was in Block #3 from November 7, 2008 to

November 15, 2008. *Id.* He was moved to Block #2 on November 15, 2008 because he was not getting along with the inmates in Block #3. *Id.* Block #2 is not a segregation unit. *Id.* During non-lockdown hours, the doors of the cells are open and the inmates can freely move about and commingle in the dayroom. *Id.*

The segregation unit, SHU 2, is in direct sight of the control booth in which the corrections officer on duty sits and monitors inmate activities, so it is also a sensible location to place an inmate complaining of illness. ECF No. 89, ¶ 6; ECF No. 90, ¶ 6. If the inmate needs something, he is within the corrections officer's sight. *Id.* Additionally, the Forks Jail does not have a separate location for housing sick inmates, so as a practical matter, inmates complaining of illness are sometimes placed in SHU 2 to protect the rest of the inmates from illness. ECF No. 90, ¶ 9; ECF No. 88, ¶ 14.)

According to Sgt. Klahn and Chief Powell, Mr. Lloyd was never placed in segregation or lock-down in retaliation for his complaints or grievances. ECF No. 88, ¶ 14; ECF No. 90, ¶ 6.)

On December 4, 2008, Sgt. Klahn received Mr. Lloyd's urinalysis results via fax. ECF No. 88, ¶ 13. The results were negative for any abnormalities. *Id.* Per Dr. Shannon's instructions, Mr. Lloyd required no follow-up medical care. *Id.*; ECF No. 23, Ex. 1, p. 8.)

On the medical questionnaire intake form completed when Mr. Lloyd was processed into the Forks City Jail on November 5, 2008, Mr. Lloyd indicated that he suffered from "acid reflux." ECF No. 119, p. 12.[4] Mr. Lloyd also stated that he was currently taking prescription medication, but the medication is not identified. *Id.*

---

[4] The intake questionnaire reflects a date of "10/05/2010" because that is when the computer was queried to print out a copy of the questionnaire. ECF No. 119, p. 11.

REPORT AND RECOMMENDATION - 10

According to Chief Powell, the Forks Jail staff understood that Mr. Lloyd was not suffering from any serious medical problems once he was discharged from the hospital on November 16, 2008. This understanding was based on the information they received from Mr. Lloyd's doctors and medical staff. ECF No. 90, ¶ 7. Based on multiple reports from other inmates, Chief Powell and the Forks Jail staff understood that Mr. Lloyd was either exaggerating or making up symptoms altogether. *Id.* Despite these reports, Chief Powell and Forks Jail staff took his complaints seriously and worked to make sure they were addressed in a timely manner. *Id.*

Mr. Lloyd was transferred to the Kitsap County Jail on December 5, 2008. According to Chief Powell, the decision to transfer Mr. Lloyd was based on his disruptive behavior, his failure to work in a harmonious nature with other inmates, and his high demands for staff attention. ECF No. 90, ¶ 9. The Kitsap County Jail is a larger facility with more staff on-hand and Chief Powell felt it was better suited to provide Mr. Lloyd with the environment he required. *Id.* Chief Powell states that the decision to transfer Mr. Lloyd was not based in any way on his complaints or grievances. *Id.*, Ex. H.

In recommending that Mr. Lloyd's claims against Dr. Bokhari be dismissed with prejudice, this court found that Mr. Lloyd provided no competent evidence that Dr. Bokhari was deliberately indifferent to his medical needs when she treated and diagnosed him. ECF No. 75, p. 3; ECF No. 87, ¶ 3. This court also found that Mr. Lloyd provided no competent medical evidence reflecting that he had suffered food poisoning and/or "toxic poisoning" to his kidneys, or that his gastritis and GERD were in any way related to the treatment Dr. Bokhari provided on November 16, 2008. ECF No. 45, p. 8. The court also concluded that Mr. Lloyd had failed to

present any evidence of actual injury attributable to Dr. Bokhari's medical treatment or lack of treatment.  ECF No. 75, p. 4.

## SUMMARY JUDGMENT STANDARD

Summary judgment will be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those positions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Calderone v. United States*, 788 F.2d 254, 259 (6th Cir. 1986).   On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the non-moving party's case.  *Celotex*, 477 U.S. at 325.  If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S. Ct. 2502, 91 L.Ed.2d 202 (1986).   The party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  "A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive."  *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

REPORT AND RECOMMENDATION - 12

The Ninth Circuit has expressly stated that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987), *cert. denied*, 484 U.S. 1006 (1988). A plaintiff cannot rest upon the allegations in his complaint, but must establish each element of his claim with "significant probative evidence tending to support the complaint." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1980). A party opposing a motion must present facts in evidentiary form and cannot rest upon the pleadings. *Anderson*, 477 U.S. 242. Genuine issues of material fact are not raised by conclusory or speculative allegations. *Lujan*, 497 U.S. 871. The purpose of summary judgment is not to replace conclusory allegations in pleading form with conclusory allegations in an affidavit. *Lujan*, 497 U.S. at 888; *cf. Anderson*, 477 U.S. at 249. Bare assertions unsupported by evidence do not preclude summary judgment. *California Architectural Bldg. Prods., supra*.

**MOTION TO STRIKE**

The Fork City Defendants move to strike as extraneous and immaterial any argument contained in Mr. Lloyd's opposition relating to a First Amendment retaliation claim, claims brought under 42 U.S.C. § 1982, 1985, 1986 and 1997, the Washington Product Liability Act, and/or the Washington Consumer Protection Act, because the court previously denied Plaintiff's motion to amend seeking to assert these claims. ECF No. 108. In addition, Mr. Lloyd invoked § 1997 for the first time in his response brief and as such, any claim under that statute is not properly plead and should not be considered.

A motion to strike is proper when a pleading contains "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. Proc. 12(f). Striking irrelevant content from the

pleadings helps "avoid the costs that arise from litigating spurious issues by dispensing with those issues prior to trial." *See, e.g.*, *Sidney-Vinstein v. A.H. Robins Co.*, 697 F.2d 880, 885 (9th Cir.1983)). The Fork City Defendants' motion to strike arguments contained in Mr. Lloyd's pleading that are not related to claims raised in his complaint is granted. However, the court will address the merits of Mr. Lloyd's claim of retaliation because, construed liberally, this claim may be reasonably inferred from his original complaint. *See,* ECF No. 4, pp. 20-21.[5]

The Fork City Defendants also move to strike as conclusory and unsupported all contentions that Mr. Lloyd suffered from "toxic poisoning" to his kidney and that he suffered from a "serious medical condition," as Mr. Lloyd has no medical training or qualifications that allow him to provide expert testimony on these issues. ECF No. 115, p. 2 (*citing* Fed. R. Evid. 701, 702). This court previously ruled that Mr. Lloyd presented no evidence of "toxic poisoning" to his kidneys to support a claim against Dr. Bokhari. ECF No. 45, p. 8. However, whether Mr. Lloyd suffered a serious medical condition that the Forks City Defendants knew about and ignored, is a matter of proof and not pleading. Accordingly, the motion to strike is denied in this regard.

### RULE 56(f) MOTION

In his response, Mr. Lloyd asks that the Fork City Defendants' motion for summary judgment be denied because they have failed to produce any "relevant discovery information," which is the subject of his motion to compel. ECF No. 112-1 (citing ECF No. 73). The court denied that motion to compel on August 30, 2010. ECF No. 101. Mr. Lloyd also fails to set forth with specificity what additional discovery is required and how it will create a genuine issue

---

[5] Accordingly, Mr. Lloyd's request that the court reconsider its previous denial of his motion to amend to include a First Amendment retaliation claim is denied as moot. *See* ECF No. 108 (Order Denying Motion to Amend)

of material fact to preclude summary judgment.  *See Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir. 1998) (*citing Garrett v. City and County of San Francisco,* 818 F.2d 1515, 1518 (9th Cir.1987) (In making a Rule 56(f) motion, a party opposing summary judgment "must make clear what information is sought and how it would preclude summary judgment."). Accordingly, Plaintiff's Rule 56(f) motion should be denied.[6]

## DISCUSSION

**A.     Eighth Amendment Claim – Denial of Medical Care and Deliberate Indifference**

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law.  *See Crumpton v. Gates,* 947 F.2d 1418, 1420 (9th Cir. 1991).  The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

The Eighth Amendment requires prison officials to take reasonable measures to guarantee the health and safety of inmates.  An official is deliberately indifferent to a serious medical need if the official "knows of and disregards an excessive risk to inmate health or safety."  *Id.* at 837.  Deliberate indifference requires more culpability than ordinary lack of due care for a prisoner's health.  *Id.* at 835.  In assessing whether the official acted with deliberate indifference, a court's inquiry must focus on what the prison official actually perceived, not what

---

[6] Supplemental discovery responses and additional records from the Forks City Jail including Mr. Lloyd's booking form, medication log, medical questionnaire form, were sent to Mr. Lloyd on October 8 and 13, 2010.  *See* ECF Nos. 119 and 120 (Declarations of William R. Fleck and Thomas P. Miller).

REPORT AND RECOMMENDATION - 15

the official should have known.  *See Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995).  If one of the components is not established, the court need not inquire as to the existence of the other.  *Helling*, 509 U.S. at 25.

Prison authorities have "wide discretion" in the medical treatment afforded prisoners. *Stiltner v. Rhay*, 371 F.2d 420, 421 (9th Cir.), *cert. denied*, *Stiltner v. Washington*, 387 U.S. 922, 87 S. Ct. 2038, 18 L. Ed. 2d 977 (1967).  To prevail on an Eighth Amendment medical claim, the plaintiff must "show that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and the plaintiff must show that they chose this course in conscious disregard of an excessive risk to plaintiff's health."  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.), *cert. denied*, *McIntosh v. Jackson*, 519 U.S. 1029, 117 S. Ct. 584, 136 L. Ed. 2d 514 (1996).  A claim of mere negligence or harassment related to medical problems is not enough to make out a violation of the Eighth Amendment.  *Franklin v. State of Oregon, State Welfare Division*, 662 F.2d 1337, 1344 (9th Cir. 1981).  Simple malpractice, or even gross negligence, does not constitute deliberate indifference. *McGuckin*, 974 F.2d at 1059.  Similarly, a difference of opinion between a prisoner-patient and prison medical authorities regarding what treatment is proper and necessary does not give rise to a § 1983 claim.  *Franklin*, 662 F.2d at 1344; *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970).

The court has already held that Mr. Lloyd received proper and adequate medical care from Dr. Bokhari and that Mr. Lloyd's claims that he suffered from food poisoning and/or "toxic poisoning" in his kidneys are conclusory and unfounded.  Similarly, Mr. Lloyd has presented no expert testimony or other competent evidence in response to the Forks City Defendants' motion for summary judgment, to show that he suffered from any medical need.  Mr. Lloyd also makes the unsupported claim that Officer Prose hampered his medical treatment by rushing his

REPORT AND RECOMMENDATION - 16

discharge and ordering that his IV be removed prematurely. However, Dr. Bokhari stated in her declaration that only authorized medical personnel can approve the discharge of a patient; that she approved the discharge of Mr. Lloyd; and, that the IV was removed appropriately and in a manner consistent with good medical care. Thus, and even assuming Mr. Lloyd's allegations regarding Officer Prose are correct, Mr. Lloyd has failed to raise a question of material fact that he was, in fact, denied appropriate medical care.

Assuming, for purposes of this motion only that Mr. Lloyd did have a serious medical need, it is undisputed that the Fork City Defendants responded to his complaints and arranged for him to receive medical treatment from the hospital physicians. The record reflects that the Fork City Defendants reacted quickly to Mr. Lloyd's complaint that his meal gave him food poisoning. Officer Prose was summoned from home to transport Mr. Lloyd to the hospital. Dr. Bokhari provided proper medical care and treatment and then authorized his release. In addition, none of Mr. Lloyd's medical treatment providers found that he was suffering from any serious medical need. Both Dr. Bokhari and Dr. Shannon deemed him fit to return to jail after they saw and treated him. Dr. Shannon assured Sgt. Klahn that Mr. Lloyd did not require any additional treatment, except a urinalysis, which was performed and given to the hospital for analysis. The evidence submitted by Mr. Lloyd confirms that after the results from the urinalysis were known, Sgt. Klahn was advised that "no medication was needed." *See,* ECF No. 113, p. 34.

Mr. Lloyd maintains that Dr. Bokhari informed him of "high levels of toxic poison in his kidneys," that this information was relayed to Sgt. Klahn and that Sgt. Klahn, in turn, relayed the information to Mr. Lloyd. These disputed facts do not raise an issue of material fact sufficient to defeat summary judgment because the record reflects that Mr. Lloyd did not have high levels of toxic poison in his kidneys; that none of the tests performed indicated that Mr. Lloyd's kidney

or kidneys were damaged; or that the dinner he consumed was linked to his elevated CPK levels. *See, e.g.,* ECF No. 21, p. 3.[7]

There is also no evidence that Mr. Lloyd had a "serious medical need for medication for Gastroenteritis," as he claims in his response. *See* ECF No. 112-1, pp. 21 and 24. Even if Mr. Lloyd suffers from gastroenteritis, there is no competent medical evidence in the record to support his contention that the "gastroenteritis" constituted a serious medical need or that it is somehow linked to his claim that he suffered from food poisoning. Certainly, medical records reflecting that Mr. Lloyd had a history of gastroenteritis "from 1989 until 2003," have no relevance to his claim that he now suffers from gastroenteritis because he contracted food poisoning from a meal served to him in 2008. *See* ECF No. 113, p. 5 and Exh. N. The record does reflect that Dr. Bokhari noted in her assessment that Mr. Lloyd had gastroenteritis and that his current medications included Prilosec. ECF No. 113, Exh. O (pp. 52 and 53). However, there is no evidence that Dr. Bokhari prescribed any medication for that condition or that the Fork City Defendants possessed and withheld medication from Mr. Lloyd.

The record also reflects that when Mr. Lloyd was booked into the Forks City Jail, he reported that he suffered from "acid reflux" and that he was taking some unidentified medication. ECF No. 120-1, p. 6. However, the jail's medication log reflects only that Mr. Lloyd was given Tums, ibuprofen and Tylenol on November 15, 2008, November 17, 2008 and,

---

[7] In the course of her treatment of Mr. Lloyd, Dr. Bokhari explained to him that his CPK level was high and that very high levels of CPK can potentially cause damage to the kidneys and that is why she administered fluids and monitored closely. ECF No., 21, p. 2. According to Dr. Bokhari, "CPK is an abbreviation for Creatine phosphoklnase, an enzyme found mainly in the heart, brain and skeletal muscle. If the CPK level is high, it usually means there has been injury or stress to the heart, the brain or muscle tissue. For example, when a muscle is damaged, CPK leaks into the bloodstream. High CPK levels may be seen in patients who have experienced a heart attack, stroke or other injury to skeletal muscles." *Id.* Test results for Mr. Lloyd indicated a CPK level approximately five times higher than the upper limits of normal, but cardiac enzymes and EKG were normal. *Id.*

November 20, 2008, respectively.  CEF No. 120, pp. 15-16.   None of Mr. Lloyd's medical

request forms or grievances mentions prescription medications or otherwise put the Fork City

Defendants on notice that he needed to take any prescribed medicine.[8]   In fact, as noted above,

after the last test (urinalysis) was performed, Sgt. Klahn was advised that Mr. Lloyd required no

medications.

This court has already examined Mr. Lloyd's contention that treatment he later received

in March is somehow related to his claim that he suffered food poisoning, and found the claim to

be without merit.[9]  Mr. Lloyd has provided no competent evidence to the contrary.  More

importantly, Mr. Lloyd lacks the medical expertise to link his symptoms or illness to food

poisoning.  Nor is he able to show that any illness he suffered was a result of a particular meal he

ate.

After viewing the summary judgment evidence in the light most favorable to Mr. Lloyd,

the undersigned concludes that his Eighth Amendment claim that the Forks City Defendants

were deliberately indifferent to his medical needs fails as a matter of law.  Mr. Lloyd has

provided no evidence that any act or omission by the Fork City Defendants violated his

---

[8] Mr. Lloyd refers to jail officials interfering with his efforts to have Prilosec purchased and delivered to him in jail.
However, the records submitted by Mr. Lloyd indicate that this incident occurred in January of 2009, when he was
incarcerated at the Kitsap County Jail.  *See, e.g.,* ECF No. 4, ¶¶ 76-78; ECF No. 9, pp. 25-29.

[9]  Mr. Lloyd was seen by Dr. Yuen S. Yee at the Harrison Medical Center in Bremerton on March 26, 2009 and
March 31, 2009 where an esophagogastroduodenoscopy, gastric biopsy and esophagcal polyp biopsy were
performed "to rule out possible ulcers, hiatal hernia and esophagitis." *See e.g.,* ECF No. 35-2, p. 14.  Dr. Yee noted
that "the patient has a history of H. Pyloric gastritis and GERD."  ECF No. 35-2, p. 11.  However, there is no
competent medical evidence in the record that treatment of Mr. Lloyd for gastritis and heartburn has any connection
to his earlier treatment by Dr. Bokhari on November 16, 2008 for elevated CPK levels.  ECF No. 45, p. 7.

REPORT AND RECOMMENDATION - 19

constitutional rights. Therefore, the undersigned recommends that the Forks City Defendants' motion for summary judgment be granted on Mr. Lloyd's Eighth Amendment claims.[10]

**B.     Retaliation**

Mr. Lloyd alleges that he was placed in segregation on November 23, 2008 to "chill" his grievances and that the Forks City Defendants transferred him to the Kitsap County Jail on December 5, 2008 in retaliation because he filed grievances. ECF No. 4, pp. 20-21.

A plaintiff can establish that his First Amendment rights have been adversely affected by retaliatory conduct only when the plaintiff shows that: (1) the plaintiff was engaged in a constitutionally protected activity; (2) the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse action was motivated at least in part as a response to the exercise of plaintiff's constitutional rights. *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999). Challenges to institutional restrictions that are asserted to inhibit First Amendment interests must also be analyzed in terms of the legitimate policies and goals of the corrections system. *Pell v. Procunier*, 417 U.S. 817 (1974).

---

[10] Mr. Lloyd's claim that the Fork City Defendants violated his Fourteenth Amendment rights by acting with deliberate indifference to his medical needs is subsumed by his Eighth Amendment claim on the same facts. The Fourteenth Amendment offers no greater protection than the Eighth Amendment which, in fact, serves as the primary source of protection. *See Whitley v. Albers,* 475 U.S. 312, 106 S. Ct. 1078, 89 L.Ed.2d 251 (1986). As noted by the Supreme Court in *Whitley*, it would be surprising if "conduct that shocks the conscience or affords brutality the cloak of law, and so violates the Fourteenth Amendment, were not also punishment inconsistent with contemporary standards of decency and repugnant to the conscience of mankind, in violation of the Eighth." *Id.* (internal citations omitted). Mr. Lloyd did not allege violation of the Fourteen Amendment with regard to his placement in segregation. ECF No. 4. In any event, the Due Process Clause "does not of its own force create a liberty interest in freedom from administrative segregation." *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). Administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration. *See, e.g., Sandin v. Conner*, 515 U.S. 472, 480, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (Due Process Clause alone confers no liberty interest in freedom from state action taken within sentence imposed). Even assuming that a liberty interest existed, Mr. Lloyd presented no evidence reflecting that the conditions he experienced in the segregation unit constituted an atypical and significant hardship in relation to the ordinary incidents of prison life. And, as far as the court can discern, Mr. Lloyd was not infracted for the behavior on which his three day segregation was based.

The Ninth Circuit has consistently held that prison staff may not retaliate against inmates for exercising their constitutional rights to file lawsuits and grievances. *Rizzo v. Dawson*, 778 F.2d 527 (9th Cir. 1983); *Barnett v. Centoni*, 31 F.3d 813 (9th cir. 1994); *Pratt v. Rowland*, 65 F.3d 802 (9th Cir. 1995); *Rhodes v. Robinson*, 408 F.3d 559 (9th Cir. 2005).

It is undisputed that after Mr. Lloyd filed grievances and/or "medical request forms" relating to his medical care, he was placed in segregation, and three days later, he was transferred to the Kitsap County Jail. *See, e.g.,* ECF No. 88, ¶ 11, Exhs. J. and K; ECF No. 88, ¶ 12. Thus, viewing these facts in the light most favorable to Mr. Lloyd, the undersigned concludes that there is sufficient evidence to raise material issues of fact with regard to the first two elements of his retaliation claim – i.e., that he was engaged in constitutionally protected activity and that the Fork City Defendants took adverse action against him sufficient to "chill" the filing of his grievances. *See, e.g., Rhodes v. Robinson*, 380 F.3d 1183, 1131 (9th Cir.2004) ("Our cases, in short, are clear that any retribution visited upon a prisoner due to his decision to engage in protected conduct is sufficient to ground a claim of unlawful First Amendment retaliation - whether such detriment "chills" the plaintiff's exercise of his First Amendment rights or not."); *see also Resnick v. Hayes*, 213 F.3d 443, 449 (9th Cir. 2000); *Hines v. Gomez*, 108 F.3d 265, 269 (9th Cir.1997).

Mr. Lloyd's retaliation claim fails, however, because he cannot show that either his placement in segregation or his transfer were motivated, at least in part, in response to the exercise of his right to file grievances.

A retaliation claim is not stated where the prisoner does not allege that the defendants' actions caused him some injury, *Resnick*, 213 F.3d 443, 449 (9th Cir.2000), or, in the case of alleged retaliatory transfer, if the decision may be upheld on a constitutionally valid basis, *Sher*

*v. Coughlin*, 739 F.2d 77, 82 (2d Cir.1984).  Retaliation is not proven by simply showing that a defendant prison official took adverse action after he knew that the plaintiff prisoner had engaged in constitutionally protected activity.  Although timing can be considered as circumstantial evidence of retaliatory event, timing alone cannot establish retaliation.  *See Pratt v. Rowland*, 65 F.3d at 808.

Here, there is no evidence of retaliation except for timing.  The summary judgment evidence reflects, and Mr. Lloyd has provided no evidence to the contrary, that the decision to place him in segregation was based on his behavior.   The evidence reflects that Mr. Lloyd was placed in SHU 2, a segregated cell based on the Fork City Jail's disciplinary policy after Mr. Lloyd was argumentative with and insubordinate to Officer Prose.  ECF No. 89, ¶ 6, Ex. A.  Mr. Lloyd disputes only that he engaged in any argument with Officer Prose the day before he was disciplined, on December 1, 2008.  ECF No. 113, p. 73.

There is also evidence that Mr. Lloyd intimidated and threatened other inmates, was disruptive to the day-to-day operations of the jail, and drained staff resources.  ECF No. 88, ¶ 14.  Mr. Lloyd was causing disturbances among other inmates.  ECF No. 89, ¶ 6; ECF No. 88, ¶ 14; ECF No. 90, ¶ 8, Exs. F and G (complaints from fellow inmates).  According to Sgt. Klahn, the best way to avoid subjecting other inmates to Mr. Lloyd's abusive behavior and threats was to segregate him.  In light of Mr. Lloyd's constant medical complaints, Sgt. Klahn believed segregation would also be appropriate as the jail does not have a designated holding cell for inmates complaining of illness.  *Id.*; ECF No. 90, ¶ 6, Exhs. D and E.  Also, the evidence reflects

that Mr. Lloyd was placed in segregation for only three days, from December 2, 2008 until his transfer to Kitsap County Jail on December 5, 2008. ECF No. 90, ¶ 6, Exh. D and E.[11]

Similarly, Mr. Lloyd's claim that the Fork City Defendants transferred him to Kitsap County Jail on December 5, 2008 as an act of retaliation is unsupported. In his declaration, Chief Powell states that the decision to transfer Mr. Lloyd was based on Mr. Lloyd's disruptive behavior, his failure to work in a harmonious nature with other inmates, and his high demands for staff attention. ECF No. 90, ¶ 9. According to Chief Powell, the Kitsap County Jail is a larger facility with more staff on-hand, which was better able to meet Mr. Lloyd's needs. *Id.*; ECF No. 88, ¶ 12, Ex. L. Mr. Lloyd's high demands for medical monitoring were another reason supporting the decision to transfer him back to Kitsap County Jail. *See, e.g.* ECF No. 88, Ex. L ("We are making plans to send you to a place that can closely monitor your condition.")

As noted above, the prisoner bears the burden of pleading and proving absence of legitimate correctional goals for the conduct of which he complains. *Pratt*, 65 F.3d at 806. At that point, the burden shifts to the prison official to show, by a preponderance of the evidence, that the retaliatory action was narrowly tailored to serve a legitimate penological purpose. *See Schroeder v. McDonald*, 55 F.3d 454, 461-62 (9th Cir.1995) (defendants had qualified immunity for their decision to transfer prisoner to preserve internal order and discipline and maintain institutional security).

The Fork City Defendants contend that the decision to place Mr. Lloyd in SHU 2 had nothing to do with his grievances, but advanced the legitimate goals of disciplining Mr. Lloyd

---

[11]Jail records reflect that the remainder of Plaintiff's time was spent in Block # 3 (November 7, 2008 to November 15, 2008); and Block 2 from November 15, 2008 until December 2. Block 2 is not a segregation unit (doors are open during non-lockdown hours and inmates move freely and commingle in the day room. ECF No. 90, ¶ 6, Exhs. D and E.

REPORT AND RECOMMENDATION - 23

after he was verbally combative with Officer Prose, protecting other inmates who were bullied and threatened by Mr. Lloyd, and protecting the resources and processes of the jail. *See, e.g.,* ECF No. 90, ¶ 8. According to Chief Powell, the segregation cell doubles as a place to house inmates complaining of illness because the jail does not have a sick call room. Thus, Mr. Lloyd's ongoing medical complaints served as a secondary reason for placing him in segregation as he could be better served by the corrections officer on-duty in the booth. *Id.*, ¶ 9. Mr. Lloyd argues that a material issue of fact is raised within the declarations of Sgt. Klahn and Chief Powell because one states that he was placed in SHU 2 for disciplinary reasons and the other states that he was placed there because his kidneys were burning. ECF No. 112-1, p. 21. A fair reading of these declarations, however, is that Mr. Lloyd was initially placed in the SHU 2 because he was argumentative and combative with Officer Prose and the segregation room was also a logical place to keep him to monitor his medical complaints.

The Fork City Defendants also contend that the decision to transfer Mr. Lloyd to Kitsap County Jail had nothing to do with Mr. Lloyd's grievances, but advanced the legitimate goals of preserving jail resources and providing Mr. Lloyd with a facility better suited to meet his needs. ECF No. 90, ¶ 9. Mr. Lloyd argues, in part, that Fork City Defendants' claim is false because, when he arrived at Kitsap County Jail, the medical staff there stated "upon chart review and records from Forks Community Hospital medical documentation does not support your claim." ECF No. 112-1, p. 20. Contrary to Mr. Lloyd's argument, this evidence tends to confirm that Mr. Lloyd was not suffering from any serious medical problems once he was discharged from the hospital on November 16, 2008.

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s]

judicial resources with little offsetting benefit to anyone.'" *Pratt*, 65 F.3d at 807 (*quoting Sandin v. Conner*, 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)).  In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory."  *Id*. (*quoting Sandin*, 515 U.S. at 482).

The undersigned concludes that such deference is warranted here, where the Fork City Defendants have shown that placing Mr. Lloyd in segregation for two days for disciplinary reasons and transferring him to another prison where his needs could be better tended, were narrowly tailored means to serve legitimate penological purposes of discipline and preserving the order, security and resources of the jail.

Having reviewed the pleadings and all submitted papers on this matter, the undersigned finds that Mr. Lloyd's allegations do not establish that the Fork City Defendants acted in retaliation when they placed in him in segregation or when they transferred him.  Accordingly, the undersigned recommends that Fork City Defendants' motion for summary judgment on Mr. Lloyd's retaliation claims be granted.

### CONCLUSION

Based in the foregoing, the undersigned recommends that that Fork City Defendants' motion for summary judgment (ECF No. 86) be **GRANTED** and that Plaintiff's claims against them be **dismissed with prejudice**.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the

REPORT AND RECOMMENDATION - 25

time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on

**November 26, 2010**, as noted in the caption.

DATED this __8th__ day of November, 2010.

Karen L. Strombom
United States Magistrate Judge